UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| JOSE VELEZ, | 4:21-CV-04121-KES |
| Plaintiff, | |
| vs. | ORDER GRANTING IN PART AND DENYING IN PART SUMMARY JUDGMENT |
| AUTOZONERS, LLC, | |
| Defendant. | |

This case centers around defendant, AutoZoners, LLC's, termination of its employee and plaintiff in this case, Jose Velez. *See generally* Dockets 1, 14. Velez sued AutoZoners for disability discrimination, retaliation, and racial discrimination under federal and state law, failure to accommodate a disability under federal law, and intentional infliction of emotional distress under state law. Docket 1. AutoZoners moves for summary judgment on all of Velez's claims. *See* Docket 29. Velez opposes AutoZoners' motion in its entirety. *See* Docket 35. For the following reasons, the court grants in part and denies in part AutoZoners' motion.

**FACTUAL BACKGROUND**

Viewing the record in the light most favorable to Velez, the court recites the following factual background:

Velez began working at AutoZoners in 2012 as a Part-Time sales employee. *See* Docket 32 ¶ 1; Docket 36 ¶ 1. In 2012, AutoZoners promoted Velez to be a Part-Time Sales Manager, and then to be a Store Manager. *See* Docket 32 ¶ 2; Docket 36 ¶ 2. In 2017, Willie Bush, a Division Human Resources Manager at the time, recommended that Velez be promoted to be a District Manager. *See* Docket 32 ¶ 4; Docket 36 ¶ 4. Bush knew Velez was Hispanic at the time Bush recommended Velez's promotion. *See* Docket 32 ¶ 5; Docket 36 ¶ 5. AutoZoners promoted Velez to be a District Manager in 2017. *See* Docket 32 ¶ 6; Docket 36 ¶ 6.

As a District Manager, Velez reported to Regional Manager Tim Hecklinski from 2017 until June 2019 and then to Brian Hedman from June 2019 until Velez's eventual termination. *See* Docket 32 ¶ 7; Docket 36 ¶ 7. Jennifer Dickens served as Velez's Regional Human Resources Manager from June 2019 until Velez's termination. *See* Docket 32 ¶ 17; Docket 36 ¶ 17. Prior to Dickens, Pierre Wallace served as Velez's Human Resources Manager. *See* Docket 34-2 at 5; Docket 37 ¶ 8; Docket 40 ¶ 8. In 2019, Velez won the District Manager of the Year award. *See* Docket 37 ¶ 5; Docket 40 ¶ 5 (not disputing award). Prior to January 2020, neither Hedman nor Dickens had any concerns with Velez's ability to perform as a District Manager. *See* Docket 34-7 at 3; Docket 33-3 at 3.

On March 10, 2020, Velez sent Dickens, Bush, and Hedman an email with the subject line "Private Information." *See* Docket 34-13 at 1. In this email, Velez said: "Please do not disclose to anyone else. Thanks[.]" *Id.* Velez

2

attached a note from a doctor indicating that Velez has experienced or may experience some forgetfulness, and that Velez would like to communicate with e-mail as much as possible. *See id.* at 2. Velez testified in his deposition that at or around the same time he sent this email to Dickens, Bush, and Hedman, he told Dickens and Bush that he had been diagnosed with bipolar disorder. *See* Docket 34-2 at 3-5. Dickens and Bush both deny knowing Velez had bipolar disorder prior to AutoZoners firing Velez. *See* Docket 33-1 ¶ 17; Docket 33-3 at 7. Hedman did not know of Velez's disability at the time of termination. *See* Docket 32 ¶ 77; Docket 36 ¶ 77.

Velez also testified in his deposition that he asked Dickens for an accommodation, namely that Dickens would send Velez an email recapping any serious conversations that they had so that he would not forget to follow up on matters. *See* Docket 34-2 at 5-6, 25. Velez testified that Dickens told him that she would not accommodate his request, and that she "firm[ly]" told him to send her an email telling her that he was not requesting an accommodation. *See id.* at 12. Velez sent this email and testified that he did so because he felt threatened by Dickens. *See id.* According to Dickens, Velez told her that he was not actually seeking an accommodation, and so in response, Dickens told him to send her an email stating he is no longer requesting an accommodation. *See* Docket 33-3 at 9-10.

Velez testified that Dickens did not conduct the interactive process to discuss how best to accommodate him. *See* Docket 34-2 at 6. According to AutoZoners' company handbook, after an employee requests an

3

accommodation, an HR manager must "engage in an interactive process with the [employee] to assess the nature of the accommodation requested . . . or the nature of the disability[.]" *See* Docket 34-14 at 18; *see also* Docket 34-3 at 4. Dickens admitted in her deposition that she did not complete this process but explained that she believed she did not need to do so because Velez did not request an accommodation. *See* Docket 33-3 at 9-10. Hedman was unaware of Velez's alleged request for an accommodation. *See* Docket 32 ¶ 78; Docket 36 ¶ 78.

Just over a month after Velez sent Hedman, Bush, and Dickens an email that attached his doctor's note, after Velez told Bush and Dickens about his bipolar disorder, and after Velez allegedly requested an accommodation, Dickens sent an email on April 20, 2020 to Hedman and Bush with the results of an investigation she had undertaken into Velez. *See* Docket 34-39 at 2; Docket 34-13 at 1; Docket 34-2 at 3-5. Soon after, Bush recommended to Hedman that Hedman terminate Velez's employment. *See* Docket 34-7 at 6; Docket 34-6 at 12. In doing so, Bush partially relied on Dickens' investigation and did not make any independent credibility determinations. *See* Docket 34-6 at 10-11. Hedman received Bush's recommendation either the night before or the morning of April 23, 2020, the day he terminated Velez. *See* Docket 34-7 at 6; Docket 34-42. Hedman did not have any verbal conversations with Bush or Dickens about the investigation or recommendation. *See* Docket 34-7 at 6. The morning Hedman terminated Velez, Hedman drove to Sioux Falls from Minneapolis to effectuate the termination. *See* Docket 34-7 at 6. Hedman

testified that he partially relied on Bush's recommendation and Dickens' investigation when deciding to terminate Velez. *See id.*; Docket 34-42. Although Hedman terminated Velez around 9:30 a.m. that day, Hedman appears to have decided to terminate Velez an hour before because he submitted the termination at 8:28 a.m. *See* Docket 34-42.

Beginning in January 2020, Dickens began investigating Velez for alleged policy violations. *See* Docket 32 ¶ 26; Docket 36 ¶ 26. Velez testified in his deposition that on January 8, 2020, he received a call from Chance Foerster. *See* Docket 34-2 at 20. Foerster was a store manager in Nebraska. *See* Docket 32 ¶ 24; Docket 36 ¶ 24 (not disputing Foerster's position). According to Velez, Foerster told Velez that Foerster had sex with a subordinate. *See* Docket 34-2 at 20. Velez further testified that the next day on Thursday, January 9, 2020, he talked with employees at Foerster's store to gather more information. *See id.* According to Velez, he attempted to report Foerster's misconduct to Dickens on either Thursday or Friday, but that he could not report the incident until Monday, January 13, 2020. *See id.* Velez sent an email on January 20, 2023 about this incident. *See* Docket 34-21. In his deposition, Velez stated that he sent this email as a follow-up to his conversation with Dickens on January 13, 2020. *See* Docket 34-2 at 20.

Relatedly, Dickens told Bush and Hedman that Velez had coached Foerster to lie during HR investigations into Foerster. Docket 34-25 at 1, 3. According to Dickens, two store managers, Erica Langarica and Ben Molden, told her that Foerster had "told each of them that [Velez] coached Foerster to

5

say that Foerster had sex with [a female subordinate] from [Foerster's] store off company property in an effort to remain employed." *Id.* at 3. Dickens also alleged that Foerster had told Langarica and Molden that Foerster had sex in a vehicle in a store parking lot but that Velez told Foerster to say they had sex off-site. *Id.* When Bush asked Velez about this allegation, Velez denied it. *See* Docket 34-40 at 3. Velez also denied it in his deposition. *See* Docket 34-2 at 31. After Dickens reported Langarica and Molden's allegations to Hedman and Bush, Langarica told Dickens that Langarica was not present during the alleged conversation between Foerster and Molden. *See* Docket 34-28 at 2. Dickens also admitted that Foerster only reported this concern to Molden *after* Foerster became aware that Velez was investigating Foerster. *See* Docket 34-3 at 16. Dickens never interviewed Foerster about this accusation because Velez had already terminated Foerster. *See id.* at 17.

Dickens was also investigating Velez's alleged failure to report Kyle Kelch, an AutoZoner employee, who sexually harassed Mindy Tadlock, a store manager. *See* Docket 32 ¶¶ 29, 33, 51; Docket 36 ¶¶ 29 (not disputing titles), 33, 51 (not disputing the harassment was sexual in nature). Velez testified that in July 2019, Kelch approached Velez while Velez was visiting Kelch's store and told Velez that Kelch was having a sexual relationship with Tadlock. *See* Docket 34-2 at 26. Velez testified that he told Kelch that it was none of Velez's business, that the relationship was not against company policy so long as Kelch and Tadlock worked at different stores, and that Kelch needed to stop discussing the matter at work. *See id.* During this conversation, Kelch asked

6

Velez if Velez wanted to see some photos on Kelch's phone. *See id.* Velez did not look at the photos, but then called Tadlock to tell her about his interaction with Kelch and that Kelch was showing everyone photos of Kelch and Tadlock. *See id.* at 27. Velez testified that when he talked with Tadlock at that time, Tadlock told him that she had no problem with Kelch and that she could handle Kelch. *See id.* at 28. According to Velez, he later learned in October 2019 that Kelch had been harassing Tadlock. *See id.* at 28, 31. Velez contends that he reported this harassment immediately to Dickens. *See id.*; Docket 38 ¶ 5. Similarly, when Bush interviewed Velez about this incident, Velez told Bush that he reported this harassment to Dickens in October 2019. *See* Docket 34-40 at 4; *see also* Docket 38 ¶ 5. Velez also told Bush that Dickens told Velez that Velez wisely did not look at the photos on Kelch's phone, but that Dickens did not otherwise provide coaching or discipline to Velez. *See* Docket 34-40 at 4; *see also* Docket 38 ¶ 5. In contrast, Dickens testified in her deposition that Velez first told her about this harassment in January 2020. *See* Docket 33-3 at 3 (showing relevant year Dickens is testifying about is 2020), 19.

Dickens interviewed Tadlock as part of her investigation into Kelch. *See* Docket 34-24. Dickens indicated in her notes to Hedman and Bush that while she spoke with Tadlock in a hotel meeting room, Velez "walked through the room at least 4-5 times during the first hour [she] was speaking with [Tadlock]." *See* Docket 33-3 at 66. Dickens found this behavior "very suspicious" and asked hotel staff if she could move to a separate private meeting room. *Id.*

During a break in the interview, Velez talked to Tadlock. *See* Docket 33-2 at 43-44, 103. When the interview resumed, Tadlock told Dickens that Velez had "asked if [Tadlock] reported that [Tadlock] owed [Kelch] money   . . . ." *Id.* Velez denies asking Tadlock about whether she told Dickens that Tadlock owes Kelch money and rather insists that he told Tadlock to "make sure [Tadlock] tells [Dickens] everything," to tell Dickens the truth, and to not hold anything back. *Id.* at 43-44.

In addition to interviewing Tadlock, Dickens interviewed several employees about an alleged strip club incident. *See* Docket 32 ¶ 51; Docket 36 ¶ 51. Velez admits that he and some employees went to a strip club. *See* Docket 34-2 at 15-16. And multiple employees, including Velez, confirmed this incident occurred while they were travelling for a training event. Docket 34-5 at 6; Docket 34-28 at 3; Docket 34-30 at 3; Docket 34-35 at 1. According to Velez, he and some employees were on a shuttle and he thought they were heading to a bar rather than a strip club. *See* Docket 34-2 at 16. By the time he realized they were at a strip club, Velez testified that the shuttle had already left and so he decided to stay for a couple of drinks and then leave. *See id.* When Bush asked Velez about this incident, Velez reiterated he did not know that the shuttle was heading to a strip club. *See* Docket 33-2 at 55. When Dickens interviewed both Moden and Langarica about the incident, Molden stated that he did not know who proposed the idea of going to the strip club, and Langarica stated that after someone had suggested going to a strip club, Velez

said, "[L]et's go! Let's see if the shuttle can take us there." *See* Docket 33-3 at 70, 74.

Velez missed work the next morning. *See* Docket 32 ¶ 52; Docket 36 ¶ 52 (not disputing that Velez missed work sessions the next morning). But the parties disagree on whether Velez missed work due to his drinking at the strip club. Velez admitted in his deposition that while at the strip club, he had one drink and felt "tipsy" and "happy," but denied feeling "wasted." *See* Docket 34-2 at 16. In his interview with Bush, Velez also denied feeling wasted. *See* Docket 33-2 at 59. Molden testified in his deposition that he did not recall how many drinks Velez had that night, but that Molden had never seen any employees get out of control while they would socialize with each other over alcohol. *See* Docket 34-5 at 6-7. Langarica, on the other hand, told Dickens in an interview that Velez was "very drunk" at the strip club and that Langarica had to take care of him and his wallet that night. *See* Docket 33-3 at 74.

At the time of the strip club incident, Wallace was Velez's HR manager. *See* Docket 34-8 at 3, 6; Docket 33-2 at 55 (Bush asking Velez whether Velez told Wallace about the strip club incident). According to Wallace, he was aware that some employees went to a strip club but thought that Jose did not actually attend. *See* Docket 34-8 at 6. Based on his understanding of the event, Wallace testified that he expressed disappointment in the "optics" of the incident but did not take further action or investigate further. *See id.* Dickens testified in her deposition that Wallace told her that he believed Velez did not go to the strip club. *See* Docket 34-3 at 13. Dickens concluded that Wallace

9

appeared to not "kn[ow] anything about the strip club [incident][.]" *See id.* In contrast, Velez testified in his deposition that he had already told Wallace "exactly" what happened regarding the strip club incident. *See* Docket 34-2 at 15.

Dickens' third investigation into Velez revolved around an employee, Emily Nielsen. *See* Docket 32 ¶¶ 45, 47; Docket 36 ¶¶ 45, 47. Velez testified in his deposition that he became aware that Nielsen had been seen with marijuana, and that he reported this allegation to Dickens. *See* Docket 34-2 at 22-23. Dickens testified she only learned of this allegation in February 2020. *See* Docket 34-3 at 5. Velez admitted that on a separate occasion, Velez forgot to report one instance of Nielsen potentially arriving high to work. *See* Docket 34-2 at 23.

During Dickens' investigation into Velez, Dickens also learned from Molden that Velez had allegedly coached another employee, Ismael Solis, Jr. *See* Docket 34-3 at 17. Solis Jr. was under investigation for being in an inappropriate relationship. *See id.* Molden did not have any evidence to back up his accusation that Velez coached Solis Jr., and merely stated that he had a feeling that Velez "might" have coached Solis Jr. *See* Docket 34-27 at 2. Dickens interviewed the employee with whom Solis Jr. was allegedly having an inappropriate relationship, and the employee told Dickens that Solis Jr. was not attempting to have any kind of romantic or sexual relationship and that there was nothing inappropriate going on. *See* Docket 34-3 at 20. Dickens reported to Bush and Hedman that she suspected Velez may have coached the

10

employee "because [Velez] was at their store that day." *See* Docket 34-25 at 1, 3.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *Morrow v. United States*, 47 F.4th 700, 704 (8th Cir. 2022) (alteration in original) (quoting *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995)). In reviewing the record, the court views the facts in the light most favorable to the non-moving party. *Lissick v. Andersen Corp.*, 996 F.3d 876, 882 (8th Cir. 2021). While "[t]he mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient[,]" *Turner v. XTO Energy, Inc.*, 989 F.3d 625, 627 (8th Cir. 2021) (citation omitted), a party moving for summary judgment is not entitled to summary judgment just because the facts he offers may appear to be more plausible or because the adversary may be unlikely to prevail at trial, *see Handeen v. Lemaire*, 112 F.3d 1339, 1354 (8th Cir. 1997).

## DISCUSSION

### I.   Federal Law Claims

#### A. Disability, Retaliation, and Race Discrimination

The Americans with Disabilities Act (ADA) prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA also prohibits an employer from retaliating against an employee for engaging in protected activity. *See Canning v. Creighton University*, 995 F.3d 603, 615 (8th Cir. 2021). Title VII of the 1964 Civil Rights Act prohibits employers from terminating an employee based on race. *See* 42 U.S.C. § 2000e-2.

Velez does not attempt to prove his disability, retaliation, and race discrimination claims through direct evidence of discrimination, but rather relies on the *McDonnell Douglas* framework for each in order to show an inference of discrimination. *See* Docket 35 at 11; *Schaffhauser v. United Parcel Service, Inc.*, 794 F.3d 899, 902 (8th Cir. 2015) ("A plaintiff may defeat summary judgment by either offering direct evidence or creating an inference of unlawful discrimination.").

As part of the *McDonnell Douglas* framework, each of these three claims first require Velez to establish a prima facie case of unlawful discrimination. *See Evans v. Cooperative Response Ctr., Inc.*, 996 F.3d 539, 545 (8th Cir. 2021) (disability discrimination); *Canning*, 995 F.3d at 615 (retaliation claim); *Grant*

12

*v. City of Blytheville,* 841 F.3d 767, 773 (8th Cir. 2016) (Title VII race

discrimination claim). Velez's burden in establishing a prima facie case is low.

*See Bunch v. University of Ar. Bd. of T.*, 863 F.3d 1062, 1068 (8th Cir. 2017).

Assuming an employee establishes a prima facie case, the burden shifts to the

employer to "articulate some legitimate, non-discriminatory reason" for the

adverse action. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803

(1973). This burden is not onerous. *Bone v. G4s Youth Services, LLC*, 686 F.3d

948, 954 (8th Cir. 2012). The burden then falls on Velez to produce evidence

sufficient to create a genuine issue of material fact regarding whether

AutoZoner's proffered nondiscriminatory justifications are a mere pretext for

intentional discrimination. *See Torgerson v. City of Rochester*, 643 F.3d 1031,

1046 (8th Cir. 2011).

The court now turns to these three stages of the *McDonnell Douglas*

framework for his federal disability, retaliation, and race discrimination claims.

### 1. Prima Facie

#### a. Racial Discrimination

To establish a prima facie race discrimination claim under Title VII, an

employee must show 1) that he was a member of a protected class, 2) that he

met the employer's legitimate employment expectations, 3) that he suffered an

adverse employment action, and 4) that the circumstances give rise to an

inference of discrimination based on race. *See Grant*, 841 F.3d at 773.

AutoZoners only contests the second and fourth elements. *See* Docket 30 at 5.

13

### (1) Whether Velez met AutoZoners' legitimate employment expectations

AutoZoners argues that Velez cannot meet this element because Velez failed to perform his job duties. *See id.* at 6. Velez won the District Manager of the Year award in 2019 and had a positive performance review for the August 2018-August 2019 review period. *See* Docket 34-6 at 5; Docket 34-20. Relatedly, neither Hedman nor Dickens had any concerns with Velez's ability to perform as a district manager prior to January 2020. *See* Docket 34-7 at 3; Docket 33-3 at 3.

Nonetheless, AutoZoners points to four specific reasons why it believes Velez failed to meet AutoZoners' job expectations, arguing Velez 1) failed to timely report allegations of company policy violations; 2) encouraged employees to lie to the company during investigations; 3) interfered with those investigations; and 4) took employees to a strip club and then became so intoxicated that his subordinate employees had to take care of him. *See* Docket 30 at 6; Docket 39 at 2. The court addresses these arguments one at a time.

Starting with Velez's alleged failure to report policy violations, AutoZoners alleges that Velez failed to report an incident of Nielsen using marijuana while doing inventory. *See* Docket 39 at 2-3; Docket 34-3 at 5. But Velez testified in his deposition that contrary to Dickens' claims, Velez did in fact report Emily's prior drug use. *See* Docket 34-2 at 22-23; *see also* Docket 38 ¶ 11 (Velez's declaration stating that he "promptly" reported Nielsen's

suspected drug use to Dickens). Thus, the record contains a material dispute of fact with respect to this alleged policy violation.

Next, AutoZoners also alleges that Velez failed to timely report Foerster's sexual relationship with a subordinate. *See* Docket 39 at 2. But viewing the facts in the light most favorable to Velez, on Wednesday, January 8, 2020, Foerster called Velez late at night to tell Velez that Foerster had sex with a subordinate. *See* Docket 34-2 at 20. Velez talked with employees at Foerster's store to gather more information the next day on Thursday, January 9, 2020. *See id.* Velez testified that he attempted to call Dickens on either Thursday or Friday. *See id.* Velez further testified that he reported this incident the next Monday on January 13, 2020 and then sent a follow up email on January 20, 2023. *See id.* at 20, 22. AutoZoners alleges that Velez did not report Foerster's misconduct until January 20, 2020 because Velez had not emailed Dickens about this incident until January 20, 2020. *See* Docket 32 ¶ 24; Docket 33-2 at 30-31; Docket 34-21. But this difference in accounts is another dispute of material fact that the jury must decide. Similarly, determining whether Velez "immediately" reported this violation, as required by AutoZoners' company policy is ordinarily a question for the jury. *See* Docket 34-2 at 17-18.

AutoZoners next points to Velez's alleged failure to report Kelch's alleged sexual harassment of Tadlock. *See* Docket 39 at 2. But viewing the facts in the light most favorable to Velez, Velez testified that as soon as he became aware of Kelch's harassment in October 2019, he reported it immediately. *See* Docket 34-2 at 28, 31; Docket 38 ¶ 5. AutoZoners argues that Velez failed to timely

15

report this incident because Velez knew about Kelch's sexual relationship with Tadlock in July 2019 and knew about some photos Kelch had shared with other employees. *See* Docket 39 at 2; *see also* Docket 38 ¶ 5; Docket 34-2 at 26, 31. But Velez testified in his deposition that he did not think he needed to report the incident in July because Velez did not know of any harassment allegations at that point, Kelch and Tadlock worked at different locations, and because Velez was unaware of the photos' content. *See* Docket 34-2 at 26. A reasonable jury could credit Velez's account, and thus this alleged policy violation raises another material dispute of fact that the jury must decide.

With respect to the final policy violation Velez allegedly failed to report, the court recognizes that Velez admitted to forgetting to immediately report one instance of Nielsen potentially arriving high to work. *See id.* at 23. But the court finds that the jury should determine whether this admitted violation is enough to show that Velez failed to meet AutoZoners' legitimate job expectations.

The court now turns to AutoZoners' second argument for why Velez failed to meet AutoZoners' job expectations, namely that Velez encouraged employees to lie to the company during investigations. *See* Docket 30 at 6. Dickens forwarded her concerns to Bush and Hedman about allegations that Velez had coached Foerster to lie during HR investigations. *See* Docket 34-25 at 1, 3. Specifically, Dickens claimed that two store managers, Langarica and Molden, stated that Foerster had "told each of them that Jose coached Foerster to say that Foerster had sex with [a female subordinate] from [Foerster's] store off

16

company property in an effort to remain employed." *Id.* at 3. Furthermore, Dickens alleged that Foerster had told Langarica and Molden that Foerster had sex in a vehicle in a store parking lot but that Velez told Foerster to say they had sex off-site. *Id.*

The record, however, contains sufficient evidence of a dispute of material fact regarding this accusation. First, Velez flatly denied this accusation when Bush asked him about it and in his deposition. *See* Docket 34-40 at 3 (Bush interview); Docket 34-2 at 31 (deposition). Second, although Dickens reported to Bush and Hedman in her investigation notes that both Molden and Langarica had reported this accusation, Langarica later told Dickens that Langarica was not present during the alleged conversation between Foerster and Molden. *See* Docket 34-28 at 2. Third, Dickens also admitted that Foerster only reported this concern to Molden *after* Foerster became aware that Velez was investigating Foerster. *See* Docket 34-3 at 16. And finally, Dickens admitted that Dickens never interviewed Foerster about this accusation because Velez had already terminated Foerster. *See id.* at 17. These four factors all undermine the credibility of this proffered reason. A reasonable jury could conclude that Velez did not in fact coach Foerster and thus this stated basis is insufficient to conclusively show Velez failed to meet AutoZoners' job expectations.

Next, Molden also reported to Dickens that Velez allegedly coached Solis Jr., another employee who was under investigation for being in an inappropriate relationship. *See id.* at 17. But when Dickens interviewed Molden

17

about this allegation, Molden admitted that he did not have any evidence to back up his accusation, and only had a feeling that coaching "might" have happened. *See* Docket 34-27 at 2. And when Dickens asked the employee with whom Solis Jr. was allegedly having an inappropriate relationship, the employee told Dickens that there was nothing inappropriate about it and that Solis Jr. was not attempting to have any kind of romantic or sexual relationship. *See* Docket 34-3 at 20. These admissions show a dispute of material fact on whether Velez had coached Solis Jr. and in turn whether Velez was meeting AutoZoners' job expectations.

Third, AutoZoners argues that Velez improperly interfered with HR investigations. Docket 30 at 6. In support, AutoZoners cites an interview that Dickens had with Tadlock as part of Dickens' investigation. *See* Docket 32 ¶¶ 39-42; Docket 34-24 (Dickens' interview of Tadlock). Dickens indicated in her notes to Hedman and Bush that while she spoke with Tadlock in a hotel meeting room, Velez "walked through the room at least 4-5 times during the first hour [she] was speaking with [Tadlock]." *See* Docket 33-3 at 66. Finding this behavior to be "very suspicious," Dickens asked hotel staff if she could move to a separate private meeting room. *Id.* During a break in the interview, Velez talked to Tadlock. *See* Docket 33-2 at 43, 103. Tadlock then told Dickens in the interview that Velez had "asked if [Tadlock] reported that [Tadlock] owed [Kelch] money . . . ." *Id.* at 43. Although Velez acknowledges speaking with Tadlock during this smoke break, he denies asking Tadlock about whether she told Dickens that Tadlock owes Kelch money. *See id.* at 43-44. Instead, Velez

18

insists that he simply told Tadlock to "make sure [Tadlock] tells [Dickens] everything," to tell Dickens the truth, and to not hold back anything. *Id.* at 43.

The record shows a material dispute of fact as to whether Velez interfered with Dickens' investigation and interview with Tadlock. Because a reasonable jury could credit Velez's account that Velez did not interfere, the court finds a reasonable jury could find that Velez was meeting AutoZoners' job expectations. The court rejects AutoZoners' third argument.

Finally, AutoZoners' argues that Velez failed to meet AutoZoners' job expectations because Velez improperly took employees to a strip club and then became so intoxicated that his subordinate employees had to take care of him. *See* Docket 30 at 6; Docket 39 at 2-3, 9. Velez admits that he and some employees went to a strip club. *See* Docket 34-2 at 15-16. And multiple employees, including Velez, confirmed this incident occurred while they were travelling for a training event. Docket 34-5 at 6; Docket 34-28 at 3; Docket 34-30 at 3; Docket 34-35 at 1.

But the record is full of conflicting accounts on exactly what happened during this incident and how much information HR knew at the time. First, the record contains a material dispute of fact as to whose idea it was to attend the strip club. For example, Langarica stated in an interview with Dickens that after someone had suggested going to a strip club, Velez said, "[L]et's go! Let's see if the shuttle can take us there." *See* Docket 33-3 at 74. But Molden told Dickens in an interview that he was not sure who proposed the idea to go to the club. *See id.* at 70. Velez also testified in his deposition that he did not

19

know that the shuttle was taking them to a strip club, but rather he thought they were heading to a bar. *See* Docket 34-2 at 16. Velez explained that when he arrived and realized the shuttle had taken them to a strip club, the shuttle had already left so Velez decided to stay for a couple of drinks and then leave. *See id.* Velez similarly told Bush that he did not know the shuttle was going to a strip club. *See* Docket 33-2 at 55.

Second, the record also contains a genuine dispute over whether Velez became so drunk at the strip club that he missed a work event the next day. Langarica told Dickens that Velez became "very drunk" at the strip club and that she had to take care of him that night. *See* Docket 33-3 at 74. Velez acknowledged that he drank that night, but described himself has feeling "tipsy" and "happy," but not "wasted." *See* Docket 34-2 at 16. Velez further testified he only had one drink. *See id.* Velez reiterated that he was not wasted during his interview with Bush. *See* Docket 33-2 at 55. Molden also testified in his deposition that he did not recall how many drinks Velez had that night but testified that although Velez would frequently socialize with other employees over drinks, Velez and the employees never got out of control. *See* Docket 34-5 at 7.

And third, the record contains conflicting accounts on whether Velez had already been reprimanded by AutoZoners prior to Velez's termination. Wallace, Velez's previous HR manager, testified in his deposition that he was aware that some employees went to a strip club but was under the impression that Jose did not actually attend. *See* Docket 34-8 at 6. In light of Wallace's

20

understanding at the time, Wallace testified that he expressed disappointment in the "optics" of the incident but did not take further action or investigate further. *See id.* Dickens's deposition testimony supports this account because Dickens testified that Wallace told her that he believed Velez did not go to the strip club. *See* Docket 34-3 at 13. Dickens concluded that based on her conversation with Wallace, Wallace appeared to not "kn[ow] anything about the strip club [incident][.]" *See id.* But Velez testified in his deposition that he had already told Wallace (the previous regional HR manager) about going to a strip club. *See* Docket 34-2 at 16. Specifically, Velez testified that he told Wallace "exactly" what happened. *See id.* at 15.

A reasonable jury could credit Velez's version of events, including that it was not his idea to go to a strip club, that he did not get wasted at the club, and that he told Wallace everything about the incident. Thus, a reasonable jury could find that because AutoZoners HR already knew about this incident and did not terminate his employment at that time, this incident does not show that Velez failed to meet AutoZoners' job expectations.

In short, the record contains ample material disputes over Velez's job performance and whether he met AutoZoner's legitimate job expectations. These factual disputes preclude summary judgment on this issue.

### (2) Whether the circumstances give rise to an inference of discrimination

AutoZoners also argues that Velez cannot show the fourth element of his prima facie case for race discrimination, namely that the circumstances give

21

rise to an inference of discrimination. *See* Docket 30 at 5; *Grant*, 841 F.3d at 773. "Evidence of pretext, normally considered at step three of the *McDonnell Douglas*, analysis can satisfy the inference-of-discrimination element of the prima facie case." *See Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010) (citing *Putnam v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003)). Because the court must also address pretext in his retaliation and disability claims, the court reserves all discussion of pretext for those claims.

### b. Retaliation and Disability

For a prima facie retaliation claim under the ADA, an employee must show 1) he engaged in statutorily protected activity, 2) the employer took an adverse action against him, and 3) a causal connection exists between the adverse action and the protected activity. *Canning*, 995 F.3d at 615.

Similarly, for a disability discrimination claim under the ADA, a plaintiff establishes a prima facie case by demonstrating that 1) he was disabled within the meaning of the ADA, 2) he was qualified to perform the essential functions of the job with or without a reasonable accommodation, and 3) a causal connection exists between an adverse employment action and the disability. *See Evans*, 996 F.3d at 545.

The court begins with Velez's prima facie retaliation claim. AutoZoners only contests the first and third elements of such claim. Docket 30 at 9. With respect to the first element, AutoZoners argues that Velez cannot show that he made a request for an accommodation and thus he was not engaged in protected activity. *See* Docket 30 at 9, 13-15. But Velez repeatedly testified in

his deposition that he requested an accommodation from Dickens and Bush. *See* Docket 34-2 at 5-6, 25. For example, Velez testified that he told Dickens that he was requesting that "any instructions that [she] give[s] [Velez] or anything that might be of importance," she "please send [Velez] an email, just a reminder, because of [Velez's] condition." *See id.* at 6. Velez echoed this testimony later in the deposition, stating that he asked Dickens that she "send [Velez] an email" of "anything that was serious and important." *See id.* at 25. Although Velez later sent an email stating he was not requesting an accommodation, Velez explained that he sent this only because he felt threatened by Dickens after Dickens immediately told him very "firm[ly]" that she would not make that accommodation and that he needed to email her that he was not actually seeking an accommodation. *See id.* at 12. Dickens denied Velez's account and instead testified in her deposition that Velez told her that he did not require any type of accommodations, and so in response Dickens told him that he should send her an email stating he is no longer requesting an accommodation. *See* Docket 33-3 at 9-10. These conflicting accounts demonstrate a material dispute of fact that is up to the jury to decide. Thus, viewed in the light most favorable to Velez, the court finds the record supports Velez's first element of his retaliation prima facie case—that he was engaged in protected activity. *See Heisler v. Metro. Council*, 339 F.3d 622, 632 (8th Cir. 2003) (holding that requesting an accommodation is a protected activity under the ADA); *see also Kirkeberg v. Canadian Pac. Ry.*, 619 F.3d 898, 907-08 (8th Cir. 2010).

AutoZoners next argues that Velez cannot establish the third element of his prima facie retaliation claim—that a causal connection exists between the adverse action and the protected activity—because Hedman "was unaware of any request for an accommodation." *See* Docket 30 at 9; *Canning*, 995 F.3d at 615. This argument echoes AutoZoners' argument with respect to Velez's disability prima facie claim. *See* Docket 30 at 7 (only arguing for purposes of summary judgment that Velez cannot establish a causal connection between AutoZoners' termination and Velez's disability because Hedman did not know of Velez's disability). The court addresses these two arguments together.

Velez acknowledges that Hedman did not know of Velez's disability or accommodation request and that Hedman was the individual who ultimately terminated Velez, but instead argues that Dickens' and Bush's knowledge of Velez's disability and accommodation request is sufficient. *See* Docket 35 at 23-25; Docket 32 ¶ 76-79; Docket 36 ¶ 76-79. In doing so, Velez relies on the "cat's paw theory of employer liability." *See Diaz v. Tyson Fresh Meats, Inc.*, 643 F.3d 1149, 1151 (8th Cir. 2011). This theory applies "in situations where 'a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory action.' " *Cherry v. Siemens Healthcare Diagnostics, Inc.*, 829 F.3d 974, 977 (8th Cir. 2016) (quoting *Qamhiyah v. Iowa State Univ. of Sci. & Tech.*, 566 F.3d 733, 742 (8th Cir. 2009)). The cat's paw theory exists to ensure that "an employer cannot shield itself from liability for unlawful termination by using a purportedly independent person or committee as the decisionmaker where the

24

decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design." *See id.* (quoting *Qamhiyah*, 566 F.3d at 742).

AutoZoners argues this theory is inapplicable to this case because neither Dickens nor Bush were Velez's supervisor. *See* Docket 39 at 6. But Hedman admitted that he partially relied on Dickens' investigation and Bush's recommendation when deciding to terminate Velez. *See* Docket 34-7 at 6. Adopting AutoZoners' argument would allow employers to escape liability so long as a biased co-worker who effectively dictates a decisionmaker's discriminatory action is not an immediate supervisor. This result circumvents the purpose of the cat's paw theory and thus the court rejects AutoZoners' argument.

Citing *Diaz*, 643 F.3d at 1151-52, AutoZoners next argues in a footnote that it is "questionable" whether the cat's paw theory applies in this case because the theory only applies to direct discrimination cases rather than *McDonnell Douglas* cases. *See* Docket 39 at 6 n.4. The court recognizes that *Diaz* observed that the Eighth Circuit had previously only applied this theory in direct evidence claims. *See Diaz*, 643 F.3d at 1152. Because the cat's paw cases involve a biased employee and a *McDonnell Douglas* framework already contemplates the absence of direct discrimination, the Eighth Circuit recognized the "doctrinal tension" in applying the cat's paw theory in a *McDonnell Douglas* case. *See id.; see also Cherry*, 829 F.3d at 976-77. But *Diaz* did not need to determine whether the cat's paw theory was

25

applicable to a *McDonnell Douglas* framework because it found the plaintiff failed to prove the cat's paw theory on its own terms. *See Diaz*, 643 F.3d at 1152.

Two Eighth Circuit cases after *Diaz* suggest that the cat's paw theory may apply in an appropriate *McDonnell Douglas* case. First, in *Rooney v. Rock-Tenn Converting Co.*, 878 F.3d 1111, 1118-1119 (8th Cir. 2018), a case involving the *McDonnell Douglas* framework, the Eighth Circuit found that the employee had failed to show the employer acted with pretext. In doing so, however, *Rooney* specifically mentioned that the employee had not "presented any evidence supporting a cat's-paw theory of liability." *See id.* at 1118. Second, in *Lovelace v. Washington Univ. School of Med.*, 931 F.3d 698, 706 n.3 (8th Cir. 2019), another case involving the *McDonnell Douglas* framework, the Eighth Circuit rejected the employee's cat's paw argument not because it was inapplicable per se, but rather because there was no evidence that the decisionmaker "did not terminate [the employee] of his own volition][.]" *See Lovelace*, 931 F.3d at 706 n.3. Thus, because the Eighth Circuit has considered at least two cases after *Diaz* in which the issue of whether an employee could invoke the cat's paw theory under a *McDonnell Douglas* scenario arose, and in both cases the Eighth Circuit suggested the theory could apply in the right set of facts, the court finds that this theory is not per se unavailable to Velez.

Perhaps sensing this conclusion, AutoZoners also argues there is no evidence in the record that Dickens or Bush harbored discriminatory animus

26

towards people with disabilities. *See* Docket 39 at 6. The record shows that Velez testified in his deposition multiple times that he told both Dickens and Bush that he suffered from bipolar disorder in March 2020. *See* Docket 34-2 at 3-6, 8, 12, 14, 25. While both Dickens and Bush denied that Velez told them that he had bipolar disorder in their respective depositions, these conflicting accounts highlight a disputed fact that is material to the case. *See* Docket 33-1 ¶ 17; Docket 33-3 at 7. Velez further testified that when he requested an accommodation from Dickens, Dickens said she was not going to do any type of accommodation and that Velez was not to request any and instead send her an email stating that he was not going to request any accommodation ASAP.[1] *See* Docket 34-2 at 6. Relatedly, Velez testified that Dickens did not conduct the interactive process to discuss how best to accommodate him. *See id.* Just over a month later, Dickens and Bush recommended to Hedman to terminate Velez's employment. *See* Docket 34-7 at 6; Docket 34-39; Docket 34-6 at 12. Hedman terminated Velez's employment either the same day or the day after receiving these recommendations. *See* Docket 34-7 at 6.

　　The court finds this close proximity in time between the time Dickens and Bush learned of Velez's disability and accommodation request, coupled with Dickens' refusal to engage in the interactive process about how to

---

[1] Dickens denies Velez's account and instead testified that Velez told her that he did not require any type of accommodations, and so in response Dickens told him that he should send her an email stating he is no longer requesting an accommodation. *See* Docket 33-3 at 9-10. This conflict is a material dispute of fact that is up to the jury to decide.

accommodate Velez, is sufficient to establish that Dickens or Bush acted with discriminatory intent when preparing their recommendations.

Finally, AutoZoners argues that even evaluating Velez's cat's paw argument on its own terms and even if Dickens or Bush harbored discriminatory intent when recommending to Hedman to terminate Velez, Hedman independently decided to fire Velez. *See Qamhiyah*, 566 F.3d at 745 (rejecting employee's cat's paw argument because the record conclusively showed that decisionmaker performed a "thorough, independent review of [the employee's] case."). The court recognizes that Hedman testified in his deposition that he "read each and every statement and then ma[de] [his] decision based off of the evidence that was brought up in the investigation." *See* Docket 34-7 at 6. But Hedman also admitted that he relied in part on Bush and Dickens' investigations and recommendations when he decided to terminate Velez. *See id.* And the timeline of events, viewed in the light most favorable to Velez, suggests a heavy reliance: On April 20, 2023, Dickens sent an email to Hedman and Bush with the results of her investigation and her accompanying notes. *See* Docket 34-39 at 2. Just a few days later, Bush, partially relying on Dickens' investigation and without conducting an independent investigation of the employees' credibility, sent a recommendation to Hedman that Hedman terminate Velez. *See* Docket 34-7 at 6; Docket 34-39; Docket 34-6 at 10-12. Hedman admitted that he received Bush's recommendation either the night before he terminated Velez at 7:25 p.m. (April 22) or the morning of (April 23). *See* Docket 34-7 at 6. Hedman further

28

admitted that he did not have any verbal conversations with Dickens or Bush about Velez or about the recommendation or investigation. *See id.* And on the morning of April 23—the same morning he terminated Velez—he drove from Minneapolis to Sioux Falls and made the decision to terminate Velez at 8:28 a.m. on April 23. *See* Docket 34-42. An hour later, Hedman terminated Velez *See id.*; Docket 34-7 at 6. Even if Hedman received Bush's recommendation the night before, a reasonable jury could find that Hedman did not thoroughly conduct an independent review, especially given that Hedman had to drive from Minneapolis to Sioux Falls that next morning. Instead, based on this evidence, a reasonable jury could find that Hedman heavily relied on Bush's recommendation, which in turn heavily relied on Dickens' investigation, when Hedman decided to terminate Velez. The court concludes that at this stage, Velez's cat's paw theory may apply. As a result, Velez has established the causation element of his prima facie case for both his disability and retaliation claims. *See Canning*, 995 F.3d at 615; *Evans*, 996 F.3d at 545.

In summary, the court finds that after viewing the record in the light most favorable to Velez, Velez has established a prima facie case of disability discrimination and retaliation.

### 2. AutoZoners' Burden

For Velez's prima facie racial discrimination, the court has found at this point that he has proven the first three elements. The court evaluates whether he can show the final element of his prima facie racial discrimination claim— whether there is an inference-of-discrimination—in the next section addressing

pretext. Regardless of Velez's racial discrimination claim, Velez has successfully made a prima facie case of disability discrimination and retaliation.

As a result, AutoZoners must meet its non-onerous burden of providing a legitimate, non-discriminatory reason for terminating Velez. *See Bone*, 686 F.3d at 954. Here, AutoZoners has submitted evidence that it believed that Velez had violated multiple company policies and failed to perform his job duties after completing an HR investigation. *See* Docket 34-7 at 6 (Heldman testifying that he relied in part on Dicken's and Bush's recommendations and on a review of witness statements); Docket 34-39 at 2-10 (showing Dickens' recommendation and accompanying documents); Docket 34-42. As discussed above, AutoZoners asserts it terminated Velez's employment because it believed Velez violated company policies in numerous ways. The court finds AutoZoners has met its burden because these justifications are legitimate and non-discriminatory. *See Richey v. City of Indep.*, 540 F.3d 779, 784 (8th Cir. 2008) ("[A]n employer's belief that the employee committed misconduct is a legitimate, nondiscriminatory reason for adverse action.").

### 3. Pretext

#### a. Race discrimination

Because the court finds that AutoZoners' met its burden in articulating legitimate and non-discriminatory reasons for terminating Velez, the burden shifts back to Velez to produce evidence sufficient to create a genuine issue of material fact regarding whether AutoZoner's proffered nondiscriminatory

justifications are a mere pretext for intentional discrimination. *See Torgerson*, 643 F.3d at 1046. Velez may show pretext in multiple ways, such as producing evidence that AutoZoners gave him favorable job performance reviews shortly before terminating him, showing AutoZoner's proffered reason for termination is unworthy of credence, or showing Autozoner failed to follow its own policies. *See Stallings v. Hussmann Corp.* 447 F.3d 1041, 1052 (8th Cir. 2006); *Main v. Ozark Health, Inc.*, 959 F.3d 319, 324 (8th Cir. 2020); *Edwards v. Hiland Roberts Dairy, Co.*, 860 F.3d 1121, 1126 (8th Cir. 2017). Additionally, for retaliation cases, close temporal proximity between an employee's protected activity and termination can be evidence of pretext. *See Corkrean v. Drake University*, 55 F.4th 623, 632 (8th Cir. 2022). The court may not view evidence of pretext in isolation, and instead must view such evidence in its totality. *See Hairston v. Wormuth*, 6 F.4th 834, 844 (8th Cir. 2021).

As discussed above, Velez had received a favorable job performance and multiple awards in the years leading up to his termination, and within less than a month of his termination. *See* Docket 34-6 at 5; Docket 34-20. Similarly, neither Hedman nor Dickens had any concerns with Velez's ability to perform as a district manager prior to January 2020. *See* Docket 34-7 at 3; Docket 33-3 at 3. Thus, this observation supports an inference of pretext. *See Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 975 (8th Cir. 2012) (" '[E]vidence of a strong employment history will not alone create a genuine issue of fact regarding pretext and discrimination,' but it 'can be relevant when considering whether the record as a whole establishes a genuine issue of material fact.' "

31

(quoting *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1020 (8th Cir. 2005))).

Velez also argues that AutoZoners's proffered reasons for termination are unworthy of credence because AutoZoner's explanations have no basis in fact. *See* Docket 35 at 11-20; *Ozark Health*, 959 F.3d at 324. "[A] plaintiff may not establish pretext simply by showing that the employer's 'honest' belief was erroneous, unwise, or even unfair." *Id.* at 325. The Eighth Circuit in *Ozark Health* explained:

> If an employer, in explaining a termination, says it believed that the employee violated company rules, then proof that the employee never violated company rules does not show that the employer's explanation was false. That proof shows only that the employer's belief was mistaken. To prove that the employer's explanation was false, the employee must show the employer did not truly believe that the employee violated company rules.

*Id.* at 324-25 (quoting *Pulczinksi v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1003 (8th Cir. 2012)). This rule applies because "[f]ederal courts do not sit as 'super personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.' " *Edmund v. MidAmerican Energy Co.*, 299 F.3d 679, 686 (8th Cir. 2002) (quoting *Cronquist v. City of Minneapolis*, 237 F.3d 920, 928 (8th Cir. 2001)). The Eighth Circuit has similarly reiterated that although one recognized method of showing pretext is by showing the employer's reasons for terminating the plaintiff is false, the plaintiff "must show *'both* that the reason was false, *and* that discrimination was the real reason.' " *King v. Guardian ad Litem Board*, 39 F.4th 979, 988 (8th Cir. 2022)

32

(emphasis in original) (quoting *Williams v. United Parcel Serv., Inc.*, 963 F.3d 803, 808 (8th Cir. 2020)).

Here, the record contains several material disputes of fact on whether AutoZoners honestly believed Velez was violating company policy and failing to meet job expectations. The Kelch issue is one example. According to AutoZoners, Velez failed to timely report Kelch's sexual harassment of Tadlock because Velez knew about the harassment in July 2019 but did not report it at that time. *See* Docket 39 at 2; *see also* Docket 38 ¶ 5 (Velez declaring that he told Dickens about Kelch harassment in October 2019 and not July 2019); Docket 34-2 at 26, 31 (Velez testifying that he did not report anything in July 2019 because Velez believed there to be no violation at that time). Velez testified that as soon as he became aware of Kelch's harassment in October 2019, he reported it immediately. *See* Docket 34-2 at 28, 31; Docket 38 ¶ 5. Velez also told Bush that when Velez reported this harassment in October 2019 to Dickens, Dickens explained that Velez was correct to not look at the photos Kelch had offered to show Velez, but did not otherwise provide coaching or discipline to Velez at that time. *See* Docket 34-40 at 4; *see also* Docket 38 ¶ 5. Contrary to Velez's claims, Dickens testified in her deposition that Velez first told her about this harassment in January 2020. *See* Docket 33-3 at 3, 19.

Viewing the record in the light most favorable to Velez, a jury could credit Velez's account that he told Dickens about this harassment in October 2019 and that Dickens did not discipline him at that time. As a result, if AutoZoners believed that Velez should have reported the harassment in July 2019, then

the fact that AutoZoners did not discipline Velez in October 2019 shows that AutoZoners either did not think Velez violated any policy or did not view the infraction as serious enough to justify termination. Yet, AutoZoners now cites this incident as a reason for terminating Velez. A jury could find that AutoZoners did not actually believe Velez violated company policy with respect to the Kelch incident or that AutoZoners did not view Velez's alleged failure to report Kelch's harassment as significant enough to warrant any discipline. Either way, a jury could infer pretext.

Dickens' investigation into the allegation that Velez coached Solis Jr. also supports Velez's argument for pretext. On February 3, 2020, Dickens first learned of this allegation from Molden. *See* Docket 34-3 at 17; Docket 34-25 at 4. Solis Jr. was under investigation for being in an inappropriate relationship, but Dickens learned from the employee with whom Solis Jr. was allegedly having an inappropriate relationship that there was nothing inappropriate about it. *See* Docket 34-3 at 17, 20. In her deposition, Dickens explained that after talking to this employee, Dickens did not investigate further. *See id.* at 20. Dickens also testified that she decided not to interview Solis Jr. based on the employee's report that there was nothing inappropriate going on between the employee and Solis Jr. *See id.* Despite Dickens' claims that her interview with the employee assuaged any concerns she had about Solis Jr., Dickens nonetheless reported to Bush and Hedman that she suspected Velez may have coached the employee "because [Velez] was at their store that day." *See* Docket 34-25 at 1, 3.

34

But the record shows no evidence to support Dickens' accusation that Velez coached the employee. Instead, the fact that Dickens decided not to interview Solis Jr. nor further investigate Solis Jr. based on her conversation with the employee suggests that Dickens trusted the employee's account. Viewed in the light most favorable to Velez, Dickens' decision to still accuse Velez of coaching the employee, despite relying on the employee's account in deciding how to proceed with her investigation, is evidence that Dickens harbored ill-will towards Velez.

Additionally, viewed in the light most favorable to Velez, the strip club investigation also demonstrates that AutoZoners is acting with pretext. As discussed above, the record contains a factual dispute over whether Velez had already been reprimanded by AutoZoners HR about this strip club incident prior to Velez's termination. *See supra*, at 20-21. Although both Wallace's and Dickens' deposition testimony suggested that Wallace was unaware that Velez himself physically went to the strip club, Velez testified that he did in fact tell Wallace "exactly" what happened, meaning Velez told Wallace that Velez went to the strip club. *See* Docket 34-8 at 6; Docket 34-3 at 13; Docket 34-2 at 15-16. A reasonable jury could credit Velez's testimony. And if a jury believes Velez's testimony that he told Wallace he went to a strip club, then a jury could find the fact that Wallace only verbally reprimanded Velez and did not take any further action immediately after learning of the incident shows that

AutoZoner's decision to terminate Velez later[2] based on this incident is pretextual.

Based on the above discussion, the record contains sufficient factual disputes regarding whether the factual allegations upon which AutoZoners justifies Velez's termination are true, and also whether AutoZoners honestly believed these allegations. The court finds that a reasonable jury could resolve these disputes in favor of Velez and as a result find AutoZoners' explanations are pretextual. Because of this finding, the court finds that Velez has not only met his burden in showing pretext, but in doing so, has met his burden of showing an inference of discrimination as required under the fourth element of his prima facie racial discrimination claim. *See Grant*, 841 F.3d at 773; *Lake*, 596 F.3d at 874. Relatedly, the court finds a jury could conclude that AutoZoners unlawfully discriminated against Velez because of his race. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (recognizing that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

AutoZoners highlights the fact that Bush recommended that Velez be promoted to District Manager in 2017 and that Velez be terminated in April 2021. *See* Docket 30 at 11-12; Docket 39 at 10; Docket 34-6 at 3, 12. Bush was also aware of Velez's race at the time Bush recommended Velez be

---

[2] None of the witnesses testified about when this strip club incident took place. But Wallace was the regional HR manager at the time and left his role after AutoZoners promoted him. *See* Docket 34-3 at 13; Docket 34-2 at 11.

promoted. *See* Docket 33-4 at 14-15. These facts, AutoZoners argues, "give rise to a 'strong inference that discrimination did not occur.' " Docket 30 at 11 (quoting *Butler v. Sivyer Steel Corp.*, 507 Fed. Appx. 642, 643 (8th Cir. 2013)).

While the court recognizes this inference in *Butler*, Velez's arguments mostly hinge on Dickens' alleged racial bias. *See, e.g.*, Docket 35 at 14-20; 24. Thus, while the fact that Bush recommended that Velez be promoted may undermine Velez's racial discrimination case, Bush's actions create another factual dispute over how much Hedman relied on Bush's versus Dickens' recommendations and investigations when deciding to terminate Velez. The court finds that a reasonable jury could find AutoZoners discriminated against Velez based on his race.

The court denies summary judgment on Velez's Title VII race discrimination claim.

### b. Disability and retaliation claim

In addition to the above analysis regarding pretext in the race discrimination claim, the court also notes other evidence of pretext for Velez's disability and retaliation claims. As discussed above, Velez first notified AutoZoners of his disability and request for an accommodation on March 10, 2020. *See* Docket 34-2 at 4 (Velez testified that he told Hedman and Dickens about his disability at the same time he gave them a physician's note); Docket 34-13 (Velez sent physician note on March 10, 2020). Just over a month later AutoZoners terminated Velez. *See* Docket 34-42 (showing termination on April

23, 2020). This temporal proximity is evidence of pretext. *See Corkrean v. Drake University*, 55 F.4th 623, 632 (8th Cir. 2022).

The court recognizes that "[e]vidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity." *See Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002). But here, as described above, the record contains genuine disputes over whether AutoZoners was genuinely concerned about Velez's job performance. Furthermore, this case is not one in which timing is the only evidence of pretext—rather, timing is just one factor amongst others. *See Gibson v. Geithner*, 776 F.3d 536, 541 (8th Cir. 2015) ("[P]roximity alone is insufficient to establish pretext.").

Additionally, evidence that an employer failed to follow its standard procedures or policies is also evidence of pretext. *See E.E.O.C. v. Product Fabricators, Inc.*, 763 F.3d 963, 970 (8th Cir. 2014). Here, the record, viewed in the light most favorable to Velez, shows that Dickens failed to follow AutoZoners' protocol when Velez requested an accommodation. According to AutoZoners' company policy handbook, once an employee requests an accommodation, an HR manager must "engage in an interactive process with the [employee] to assess the nature of the accommodation requested . . . or the nature of the disability[.]" *See* Docket 34-14 at 18; *see also* Docket 34-3 at 4. Dickens admitted in her deposition that she did not complete this process. *See* Docket 33-3 at 9-10. According to Dickens, she did not need to complete this

38

process because Velez did not request any accommodation. *See id.* at 10. But although Velez indicated on an AutoZoners form that he was not requesting an accommodation, Velez testified in his deposition that after he verbally requested a specific accommodation from Dickens, Dickens immediately told him very "firm[ly]" that she would not make that accommodation and that he needed to email her that he was not actually seeking an accommodation. *See* Docket 34-31 at 2; Docket 34-2 at 12. The record contains a factual dispute over whether Velez requested an accommodation and as a result whether Dickens failed to follow AutoZoners' policy of handling employee accommodation requests. A reasonable jury could credit Velez's account and thus a reasonable jury could find Dickens' failure to follow AutoZoners' policy to be evidence of pretext.

In summary, the court finds the record contains sufficient evidence, when viewed in the light most favorable to Velez, to establish that AutoZoners' proffered reasons for terminating Velez are pretextual and that AutoZoners discriminated against Velez because of his disability and his request for an accommodation. The court denies summary judgment on Velez's disability and retaliation claims.[3]

---

[3] Velez raises several other arguments for pretext. First, Velez contends that even if some of AutoZoner's proffered justifications for termination had some factual basis, AutoZoner's justifications that Velez failed to report policy violations and coached/interfered with human resources investigations are so "intertwined and suspect such that [Velez] need not, at this stage, refute all of them." Docket 35 at 12 (citing *Kempf v. Hennepin Cty.*, 987 F.3d 1192, 1197 (8th Cir. 2021)). Second, Velez also argues that AutoZoners treated other similarly situated employees more favorably. *See id.* at 22, 26-28. The court need not address these arguments because the court finds that even setting

### B. Failure to Accommodate

The ADA prohibits employers from "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee." 42 U.S.C. § 12112(b)(5)(A). "To determine whether an accommodation for the employee is necessary, and if so, what that accommodation might be, it is necessary for the employer and employee to engage in an interactive process." *Sharbono v. Northern States Power Co.*, 902 F.3d 891, 894 (8th Cir. 2018) (quotations omitted).

"[A] plaintiff can survive summary judgment on a reasonable-accommodation claim by showing that the employer failed to engage in an interactive process, even though failing to do so does not itself give rise to liability under the ADA." *Ehlers v. Univ. of Minnesota*, 34 F.4th 655, 660 (8th Cir. 2022) (citing *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 952 (8th Cir. 1999)). To establish that an employer failed to participate in the interactive process, an employee must show: (1) the employer knew about the employee's disability; (2) the employee requested accommodation or assistance for his disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodation; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith. *See Ehlers*, 34 F.4th at 661. The record contains a genuine dispute of material fact about

---

these arguments aside, a reasonable jury could find that AutoZoners acted with pretext.

whether an employer acted in good faith when, among other things, it discontinued discussing accommodations, and did not investigate the employee's abilities. *See Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.*, 439 F.3d 894, 902-03 (8th Cir. 2006).

For the reasons discussed above, the court finds a genuine dispute exists over whether AutoZoners knew about Velez's disability, whether Velez requested an accommodation for his disability, and whether AutoZoners made a good faith effort to accomodate his disability given Dickens' alleged failure to engage in the interactive process. AutoZoners argues that even if Velez requested an accommodation, Velez's failure to accommodate claim must fail because his request "occurred well after [Velez] was being investigated for serious performance deficiencies." *See* Docket 30 at 14. In support, AutoZoners cites *Schaffhauser*, 794 F.3d at 906, a case in which an employee requested an accommodation after learning that his employer was investigating him for using offensive language. *See* Docket 30 at 15. The Eighth Circuit in *Schaffhauser* held that the employee's accommodation request was too late because the employee only requested an accommodation after engaging in misconduct and "learn[ing] of an impending adverse employment action[.]" *See Schaffhauser*, 794 F.3d at 906.

The record here contains a genuine dispute over whether Velez in fact knew that AutoZoners was investigating him for most of the misconduct that AutoZoners alleges. *See* Docket 34-2 at 22, 31 (Velez testifying in deposition that he was unaware of an investigation into his conduct). Velez was aware of

41

one instance that AutoZoners was disciplining him—his failure to report that Nielsen was potentially arriving high to work—before he requested an accommodation. *See id.* at 23. The court finds, however, that a reasonable jury could conclude that AutoZoners nonetheless failed to accommodate Velez. The severity of Velez's admitted misconduct is up to the jury, and thus the court rejects AutoZoners' argument that Velez's request for an accommodation after he failed to report Nielson's potential drug use compels summary judgment in AutoZoners' failure.

AutoZoners next argues that Velez's requested accommodation was not reasonable as a matter of law. *See* Docket 30 at 13-14; Docket 39 at 10-11. In support, AutoZoners cites two cases, *Minnihan v. Mediacom Comm. Corp.*, 779 F.3d 803, 813 (8th Cir. 2015) and *Riggs v. Bennet Cty. Hosp. & Nursing Home*, Civ. 16-5077-JLV, 2019 WL 1441205 (D.S.D. Mar. 31, 2019). In *Minnihan*, a technician-employee for a communications company, as part of his job, was required to drive to customers' homes. *See* 779 F.3d at 807. The employee later had multiple seizures that prevented the employee from driving for six months every time he suffered a new seizure. *See id.* at 807-08. The employee requested that the company restructure his current job so that he no longer needed to drive, but the Eighth Circuit held that this accommodation was not required under the ADA because "other employees had to perform tasks for him[] or drive him to off-site locations" and "an accommodation that would cause other employees to work harder, longer, or be deprived of opportunities is not mandated" under the ADA. *See id.* at 813 (quotation omitted).

42

Similarly in *Riggs*, an employee who worked as an emergency medical technician (among other roles) requested that her employer allow her to bring a service dog to work to help with her depression and PTSD. *See Riggs*, 2019 WL 1441205, at *2, *5. The employee acknowledged that this request would have required other employees to supervise the service dog when she was on ambulance calls. *See id.* at *12. Notably, multiple co-employees stated that the dog had urinated on the floor and ran throughout the workplace (a hospital) without a leash. *See id.* at *2-3. The court, citing *Minnihan*, found this request to be unreasonable on its face because it required other employees to work harder and longer by taking care of the employee's dog. *See id.* at *12.

AutoZoners argues that similar to *Riggs* and *Minnihan*, Velez's request that Dickens recount important instructions or conversations she had with him in an email is unreasonable because it would require Dickens to work harder and longer by sending emails memorializing her conversations with Velez. *See* Docket 30 at 13-14. The court recognizes that language in these cases—namely that accommodations that require other employees to work harder or longer are not required under the ADA—if taken literally, may support AutoZoners' position. *See Minnihan*, 779 F.3d at 813; *Riggs*, 2019 WL 0110005, at *12. But most reasonable accommodations, at least to some extent, will require some additional work on the part of another employee. For example, Congress listed examples of reasonable accommodations to include:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

43

> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9). This definition expressly contemplates *actions* that an employer (through their employees) must do, such as "making," "restructuring," "acqui[ring] or modif[ying]," "adjust[ing]" and "provi[ding]" certain things, in order to accommodate an employee. In other words, the employer, through its employees, must work longer or harder than they otherwise would have to in order to make a reasonable accommodation for an employee with a disability. Thus, the language in *Minnihan* and *Riggs*—that a reasonable accommodation cannot require other employees to work harder or longer hours—must be read in light of Congress's recognition that some extra work is inherent in accommodating a disability. Instead, the court finds a better reading of *Minnihan* and *Riggs* to hold that an accommodation cannot require other employees to work *unreasonably* longer or harder. This reading comports with the ultimate dictates of the ADA: that an employer make *reasonable* accommodations to employees with known disabilities. *See* 42 U.S.C. § 12112(b)(5)(A). This reading is also consistent with the facts of *Minnihan* and *Riggs.* In *Minnihan*, driving was an essential function of the employee's position, and yet the employee's proposed accommodation required other employees to drive to off-site locations and work additional hours. *See Minnihan*, 779 F.3d at 812-13. In *Riggs*, the employee's requested

accommodation of bringing a service dog would have required co-employees to take care of the dog while the employee responded to ambulance service calls, even though the dog had urinated in the hospital and wondered around without a leash. *See Riggs*, 2019 WL 1441205, at *2-3, 12. In both cases, the accommodations plainly required other employees to unreasonably work longer and harder.

Here, Dickens sent a short email to Velez recapping a conversation on at least one occasion after he requested she do so, even though Velez testified in his deposition that Dickens told him she would not send these recap emails. *See* Docket 34-32 at 1; Docket 33-2 at 34-35; Docket 34-2 at 8-9. Velez also made clear in his deposition that he did not request an email after every exchange that he had with Dickens, but rather only after serious and important discussions. *See* 34-2 at 25. Thus, the fact that Dickens sent a brief email, viewed in the light most favorable to Velez, shows that there is a material dispute about whether Velez's request would require Dickens to work unreasonably harder or longer. The court finds that in this case, determining whether Velez's accommodation request was reasonable is a question for the jury. *See E.E.O.C. v. Convergys Customer Mgmt. Grp., Inc.*, 491 F.3d 790, 796 (8th Cir. 2007) ("Whether an accommodation is reasonable is a question of fact to be decided by a jury.").

AutoZoners attempts to argue that because Dickens sent an email recapping her conversation with Velez and because Velez admitted that there were no other discussions that Dickens would have needed to recap before

45

Velez's termination, Velez cannot show that she actually denied him any accommodation. *See* Docket 30 at 16; Docket 39 at 12; Docket 34-2 at 25 (Velez testifying in his deposition that he was not aware of any conversations between the time Velez requested an accommodation and when AutoZoners terminated him that Dickens did not recap their conversations). But AutoZoners fired Velez just over month after Velez requested an accommodation. Docket 34-2 at 25. And according to Velez, Dickens firmly told him she would not accommodate him. *See id.* at 12, 22. Just because Dickens may have recapped a conversation in an email after telling Velez she would not do so does not suddenly shield AutoZoners from potential liability, because Velez requested emails on an ongoing basis after all important conversations, not just one conversation. Adopting AutoZoners' argument would allow an employer to tell an employee that they will not accommodate an employee, fully intend on not accommodating such employee for the majority of the time and instead accommodate him once, fire the employee before additional accommodations would be needed, and then point to the one accommodation as evidence that the employer always granted accommodations, all in an effort to avoid liability. The court declines to adopt this argument.

In conclusion, after viewing the record in the light most favorable to Velez, the court finds Velez has met all four elements of his failure to accommodate claim. Thus, the court denies summary judgment on this claim.

## II.   State-Law Claims

Velez raises several state-law claims that parallel his federal claims. *See*
Docket 1. The court exercises supplemental jurisdiction under 28 U.S.C.
§ 1367 because these state-law claims "form part of the same case or
controversy" as his federal claims. The court applies South Dakota substantive
law to these state-law claims. *See Chew v. Am. Greetings Corp.*, 754 F.3d 632,
635 (8th Cir. 2014); *Witzman v. Gross,* 148 F.3d 988, 990 (8th Cir. 1998)
(holding that federal courts apply state substantive law when courts exercise
supplemental jurisdiction over state law claims). In doing so, federal courts
must follow the decisions of the state's supreme court interpreting the forum's
law. *See C.S. McCrossan Inc. v. Fed. Ins. Co.*, 932 F.3d 1142, 1145 (8th Cir.
2019). But if a state's supreme court "has not spoken on an issue, [federal
courts] must predict how it would decide the issue[,]" and "may consider
relevant state precedent, analogous decisions, considered dicta  . . . and any
other reliable data." *Olmsted Med. Ctr. v. Cont'l Cas. Co.*, 65 F.4th 1005, 1008
(8th Cir. 2023) (alteration in original) (quoting *Brill ex rel. Brill v. Mid-Century
Ins. Co.*, 965 F.3d 656, 659 (8th Cir. 2020)).

### A. Disability Discrimination

Velez raises a parallel state-law disability claim under the South Dakota
Human Rights Act, SDCL § 20-13-10.[4] The court is unaware of any South

---

[4] The South Dakota Human Rights Act provides

It is an unfair or discriminatory practice for any person, because of
race, color, creed, religion, sex, ancestry, disability, or national
origin, to fail or refuse to hire, to discharge an employee, or to accord

Dakota Supreme Court decision to elaborate on the standards that it would use in evaluating such a claim, but the court predicts the South Dakota Supreme Court would use the same framework under the ADA. *See Petersen v. ProxyMed, Inc.*, 617 F.Supp.2d 835, 845 (D.S.D. 2008); *see also Huck v. McCain Foods,* 479 N.W.2d 167, 169 (S.D. 1991) (analyzing § 20-13-10 claims raising analogous Title VII claims under Title VII framework). Thus, the court denies summary judgment on Velez's state-law disability discrimination claim for the same reasons it denies summary judgment on his disability discrimination claim under the ADA.

### B. Retaliation

Velez alleges retaliation in violation of SDCL § 20-13-10. The South Dakota Supreme Court follows the same framework for retaliation claims under the South Dakota Human Rights Act as federal courts do for retaliation claims under the ADA, and thus the above analysis applies to Velez's state retaliation claim. *See Davis v. Wharf Resources (USA), Inc.*, 867 N.W.2d 706, 716 (S.D. 2015). The court denies summary judgment on Velez's state retaliation claim.

---

adverse or unequal treatment to any person, employee, or intern with respect to application, hiring, training, apprenticeship, tenure, promotion, upgrading, compensation, layoff, or any term or condition of employment.

SDCL § 20-13-10.

### C. Race Discrimination

Velez also alleges racial discrimination in violation of SDCL § 20-13-10. The South Dakota Supreme Court uses the same framework that Title VII claims use to evaluate analogous discrimination claims under South Dakota's Human Rights Act, SDCL § 20-13-10. *See Huck v. McCain Foods,* 479 N.W.2d 167, 169 (S.D. 1991); *see also Axness v. Aqreva*, 118 F. Supp.3d 1144, 1157-58 (D.S.D. 2015). Thus, the above analysis with respect to Velez's Title VII race discrimination claim applies to Velez's state race discrimination claim. The court denies summary judgment on Velez's racial discrimination claim under the South Dakota Human Rights Act.

### D. Intentional Infliction of Emotional Distress

Under South Dakota law, for a plaintiff to prevail on an intentional infliction of emotional distress claim, a plaintiff must show:

> (1) an act by the defendant amounting to extreme and outrageous conduct; (2) intent on the part of the defendant to cause the plaintiff severe emotional distress; (3) the defendant's conduct was the cause in-fact of plaintiff's distress; and (4) the plaintiff suffered an extreme disabling emotional response to defendant's conduct.

*Anderson v. First Century Fed. Credit Union*, 738 N.W.2d 40, 51-52 (S.D. 2007). "Proof under this tort must exceed a rigorous benchmark." *Harris v. Jefferson Partners, L.P.*, 653 N.W.2d 496, 500 (S.D. 2002). The defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community." *Harvey v. Reg'l Health Network, Inc.*, 906 N.W.2d 382, 395 (S.D. 2018) (quoting *Harris*, 653 N.W.2d at 500). Liability for

49

this tort does "not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities." *Id.* Instead, the conduct must be of a nature that is "calculated to cause," and which actually causes, extremely serious mental distress. *Citibank (S.D.). N.A. v. Hauff*, 668 N.W.2d 528, 535 (S.D.2003) (quoting *Richardson v. E. River. Elec. Power Coop., Inc.*, 531 N.W.2d 23, 27 (S.D.1995)). Determining whether the defendant's conduct is sufficiently extreme and outrageous is initially for the court. *See Richardson*, 531 N.W.2d at 28.

Here, even viewing the record in the light most favorable to Velez, the court finds that AutoZoners's actions do not rise to the high level to be considered sufficiently extreme and outrageous. The Eighth Circuit's decision in *Keathley v. Ameritech Corp.*, 187 F.3d 915, 925-26 (8th Cir. 1999), *abrogated on other grounds by Torgerson*, 643 F.3d 1031, confirms this conclusion. In *Keathley*, the Eighth Circuit denied summary judgment on an employee's age discrimination claims. *See* 187 F.3d at 925. The employee sued the employer for intentional infliction of emotional distress under Missouri state law, which applied an identical test as applies to South Dakota claims when determining whether behavior was sufficiently extreme and outrageous. *See id.* The Eighth Circuit affirmed dismissal of the employee's intentional infliction of emotional distress claim, even though the "record support[ed] [the employee's] allegations that [the employer] created a contrived file in order to justify [the employee's] dismissal[.]"

50

As discussed above, the record, viewed in the light most favorable to Velez, supports a finding that Dickens wrongfully targeted Velez because of his race, disability status, and/or his request for an accommodation by wrongfully accusing Velez of violating company policies to justify his termination. *See supra*, at 30-37. But just as the employer's purposeful actions of contriving allegations in order to justify an employee's dismissal was insufficient to constitute extreme and outrageous behavior in *Keathley*, so too is Dickens' and AutoZoner's alleged behavior.

Furthermore, the record does not contain any evidence that Heldman terminated Velez in an extreme or outrageous manner, such as firing him in front of the entire company or by yelling at Velez. *See Richardson*, 531 N.W.2d at 28-29 (finding employee failed to show extreme and outrageous behavior when employer terminated employee in private conference room without raising voice and escorting employee out of the building immediately following termination).

In arguing that the record contains sufficient evidence of extreme and outrageous behavior, Velez cites *Kjerstad v. Ravellette Pub'lns*, 517 N.W.2d 419, 429 (S.D. 1994). But *Kjerstad* does not alter the court's analysis. That case involved an employer who spied on three employees who were using the restroom through a hole in the wall. *See Kjerstad*, 517 N.W.2d at 429. This behavior, the South Dakota Supreme Court reasoned, was enough to trigger a reasonable mind to believe that the employer's actions constituted extreme and outrageous conduct. *See id.* at 430. Thus, the Supreme Court reversed the trial

51

court's decision to issue a directed verdict in favor of the employer. *See id.* at 428, 430.

This case does not raise to the level in *Kjerstad* because spying on employees while using the restroom is an extreme invasion of privacy and bodily autonomy. Here, although the court recognizes that being terminated was likely upsetting to Velez and that experiencing discrimination can be deeply hurtful, the court finds that Velez does not meet South Dakota's "rigorous" standard of what constitutes extreme and outrageous behavior. *See Reynolds v. Ethicon Endo-Surgery, Inc.*, 454 F.3d 868, 873-74 (8th Cir. 2006) (applying South Dakota law and observing that "[w]hile termination from a job may be upsetting, this does not in itself constitute extreme or outrageous conduct."); *Dunn v. Lyman Sch. Dist. 42-1*, 35 F. Supp. 3d 1068, 1092-93 (D.S.D. 2014) (granting summary judgment on employee's South Dakota based intentional infliction of emotional distress claim and stating "[w]hile no doubt upsetting to [the employee], the [employer']s nonrenewal of his contract, even if done on an illegitimate basis, was not done in a manner involving extreme or outrageous conduct 'calculated to cause' serious emotional distress."). The court grants summary judgment in favor of AutoZoners on Velez's intentional infliction of emotional distress claim.

## Conclusion

The court denies AutoZoners' summary judgment motion for Velez's state and federal discrimination claims based on race, disability, and retaliation. The court also denies AutoZoners' summary judgment motion for Velez's failure to

accommodate claim under the ADA. The court grants AutoZoners' summary judgment motion for Velez's intentional infliction of emotional distress claim. For the above reasons, it is ORDERED:

(1)    That defendant's motion for summary judgment is GRANTED in part and DENIED in part;

(2)    That defendants' motion for summary judgment on Count I (Disability Discrimination in violation of the Americans with Disabilities Act) is DENIED;

(3)    That defendants' motion for summary judgment on Count II (Failure to Accommodate Disability in violation of the Americans with Disabilities Act) is DENIED;

(4)    That defendant's motion for summary judgment on Count III (Retaliation in violation of the Americans with Disability Act) is DENIED;

(5)    That defendant's motion for summary judgment on Count IV (Racial Discrimination in violation of Title VII of the Civil Rights Act) is DENIED;

(6)    That defendant's motion for summary judgment on Count V (Disability Discrimination in violation of the South Dakota Human Rights Act) is DENIED;

(7)    That defendant's motion for summary judgment on Count VI (Retaliation in violation of the South Dakota Human Rights Act) is DENIED;

(8)     That defendant's motion for summary judgment on Count VII (Racial Discrimination in violation of the South Dakota Human Rights Act) is DENIED; and

(9)     That defendant's motion for summary judgment on Count VIII (Intentional Infliction of Emotional Distress) is GRANTED.

Dated August 11, 2023.

BY THE COURT:

*/s/ Karen E. Schreier*

KAREN E. SCHREIER

UNITED STATES DISTRICT JUDGE